UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LAURI BROWN,

                    Plaintiff,                    Civil Case No. 2:08-CV-11877

vs.

                                                  PAUL D. BORMAN
SUN LIFE ASSURANCE COMPANY                        UNITED STATES DISTRICT JUDGE
OF CANADA and ART VAN
FURNITURE, INC.

                    Defendant.
_____ /

---

**OPINION AND ORDER: (1) DENYING PLAINTIFF'S MOTION FOR JUDGMENT,
(2) GRANTING DEFENDANT SUN LIFE INSURANCE COMPANY OF CANADA'S
MOTION FOR ENTRY OF JUDGMENT, AND
(3) DISMISSING PLAINTIFF'S ERISA BREACH OF FIDUCIARY DUTY CLAIM
AGAINST DEFENDANT SUN LIFE**

Now before the Court are the parties' cross-motions to affirm or reverse defendant Sun Life

Assurance Company of Canada's ("Sun Life") decision to deny long term disability benefits to

plaintiff Lauri Brown ("Plaintiff"). A hearing on these issues was held on January 7, 2009. For the

following reasons, the Court DENIES Plaintiff's Motion for Judgment, GRANTS Sun Life's Motion

for Entry of Judgment, and DISMISSES Plaintiff's ERISA breach of fiduciary duty claim against

Sun Life.

I.       BACKGROUND

This case involves a claim for continuing disability benefits against the claimant's former

employer and the employer's current plan administrator.

Plaintiff, a resident of Macomb County, Michigan, was a sales associate employee of

defendant Art Van Furniture, Inc. ("Art Van").  (Compl. ¶ 1).  Defendants Art Van and Sun Life (collectively "Defendants") are corporations, conducting business in Macomb County, Michigan. (*Id.* ¶ 5).

### A.    Art Van's Disability Benefit Plan

Plaintiff is a participant in a welfare benefit plan called the Art Van Furniture, Inc. Employee Disability Benefit Plan ("Plan").  (R. 468–526).  The Plan was issued by UNUM Provident to Art Van, as policy holder, for the benefit of Art Van's employees and was in effect when Plaintiff became disabled.

To be eligible for benefits under the Plan, an insured must be totally disabled, which means that "during the Elimination Period [of 180 days] and the next 24 months, the Employee, because of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation."  (R. 473, 483).  According to the Plan, "Material and Substantial Duties" is defined as "the essential tasks, functions, skills or responsibilities" of Plaintiff's former position, excluding any duties that could reasonably be modified.  (R. 481).  "Own Occupation means the usual and customary employment that the Employee performed as it is generally recognized in the national economy . . . not limited to the job or position the Employee performed."  (R. 482).

The Plan requires Plaintiff to submit proof of her purported disability, including a description of the disability, the date the disability occurred, the cause of the disability, and evidence that she remained under the care of a physician who provided appropriate treatment and examination.  (R. 501, 523).  The proof must be "satisfactory" to Sun life and must include objective evidence—e.g., physician's records, narrative reports, and diagnostic testing materials—in support of the purportedly disabling condition.  (R. 523).

2

According to the Plan, Art Van "has delegated to Sun Life its entire discretionary authority to make all final determinations regarding claims for benefits . . . [such as] the determination of eligibility for benefits . . . and the amount of any benefits due, and to construe the terms of [the Plan]."  (R. 523).

**B.      Plaintiff's Medical History**

On January 1, 2005, Plaintiff was involved in a motor vehicle accident in which her vehicle was struck from behind while she waiting in a drive-thru lane at a McDonalds restaurant in Warren, Michigan.  (R. 53–54).  Shortly after the accident, Plaintiff went to the emergency room at St. Joseph Mercy of Macomb Hospital.  (R. 177).  A cervical spine x-ray revealed an anterior ossific small density at C4-C5 possibly representing a spur or a tiny avulsion fragment.  (R. 177).

On January 7, 2005, Plaintiff visited her primary care physician, Dr. Mann Askar, M.D.  Dr. Askar ordered a magnetic resonance imagining ("MRI") of Plaintiff's spine.  The MRI indicated a very small annular disc bulge at C4-C5 and C5-C6. (R. 264).  Dr. Askar noted that Plaintiff did not have spinal stenosis or neural foraminal narrowing.  (R. 264).

Dr. Askar then referred Plaintiff to Dr. Young I. Seo, M.D., who examined Plaintiff for the first time on February 7, 2007.  Dr. Seo indicated that Plaintiff "was not in distress but seemed to be annoyed," that "Spurling's foramina compression test was equivocal on right," and that her Brachioradialis relex was absent on the right and just a trace on the left. (R. 283).   An electromyography ("EMG") performed on Plaintiff's spine showed no evidence of cervical root irritation.  (R. 284).  Dr. Seo concluded that Plaintiff seems to have a nerve root irritation at C6, but it was not serious enough to register on an EMG as a damaged nerve.   He opined a good prognosis and response to treatment.

3

Over the next several weeks, Dr. Seo examined Plaintiff on six more occasions. (R. 286, 288, 290, 293, 295, 296). At first, Dr. Seo only recommended that Plaintiff stay off of work for a week, even informing her on February 9, 2005 that she could return to work seeing that she could control her workload and pace. After subsequent examinations, Dr. Seo eventually extended her medical leave to April 15, 2005. During these next six visits, Dr. Seo conducted a Spurling manuever three times, which was positive for C6 and/or C7 root irritation; administered an epidural block at C6 and/or C7 at each visit; and tested Plaintiff's reflexes at each visit. (R. 286, 288, 290, 293, 295, 296). By the March 29, 2005 visit, Plaintiff showed improvement in her reflex tests. (R. 296).

On April 12, 2005, Plaintiff was involved in another motor vehicle accident in which Plaintiff's southbound-traveling vehicle was struck on the driver's side by another southbound vehicle, which had been pushed into Plaintiff's vehicle after it was struck on its driver's side by a third vehicle traveling westbound. (R. 304–06). That same day, Plaintiff was again treated at St. Joseph Mercy of Macomb Hospital for injuries resulting from the motor vehicle accident. (R. 180). The hospital took several x-rays, including cervical spine, chest, lumbar spine and pelvic, after Plaintiff complained of tingling and numbness of the upper extremities with pain in the spine from the neck down to the buttocks. (R. 183). The cervical spine x-rays revealed no cervical vertebral body compression or subluxation. (R. 183). The lumbar spine x-rays indicated no lumbar vertebral body compression, fracture deformity or subluxation and no bony destructive process or paraspinal soft tissue mass. (R. 183). The chest x-ray revealed no pulmonary consolidation, infiltration, pleural effusion or pneumothorax. (R. 183). The pelvic x-rays showed no evidence of a fracture, dislocation or bony destructive or erosive process. (R. 184).

4

After the second accident, the record indicates that Dr. Seo examined Plaintiff eight more times, with the first examination taking place on April 18, 2005 and the last on August 9, 2005.[1]  (R. 25, 133–140).  As before, Plaintiff generally complained of shoulder, neck, and back pain except for the April 18, 2005 visit when Plaintiff reported a new symptom of pain radiating down her left leg.  (R. 133–140).  The Spurling foramina compression test was positive on the right during the first two examinations and then became positive bilaterally at the June 28, 2005 and July 11, 2005 visits.  (134–135, 139–40).  By the July 26, 2005 examination, Plaintiff's brachioradialis reflex was trace on the left and 1+ on the right and her triceps reflex was absent on the left and 1+ on the right.  (R. 133).  At six of these examinations, Dr. Seo again administered epidural blocks to relieve Plaintiff's symptoms.  (R. 133, 135–137, 139, 140).  During a visit on May 24, 2005, another EMG conducted on Plaintiff showed a "mild" radiculopathy at the C5 level on the right side with no evidence of peripheral polyneuropathy.[2]  (R. 131, 137).  In addition, Plaintiff continued to attend physical therapy from April 25, 2005 through August 3, 2005.  (R. 343).

### C.    Plaintiff's Disability Claim

Following the first motor vehicle accident, on January 1, 2005, Plaintiff continued to work as a sales associate at Art Van.  On February 7, 2005, however, Plaintiff filed for medical leave under the Family and Medical Leave Act and began her medical leave that same day.   (R. 306).  Although Plaintiff's medical leave began as temporary, Plaintiff did not return to work at Art Van

---

[1] The record does not contain physician's notes for an examination of Plaintiff on August 9, 2008, but the Long Term Disability Attending Physician's Statement indicates that Dr. Seo's last examination of Plaintiff took place on August 9, 2008.

[2] According to Dr. Seo, the EMG resulted in a "number of findings in the paracervical muscles with extremely increased exertional activities in biceps and deltoid noted which was a new finding for the patient or possibly missed from the first EMG done in February."  (R. 137).

after February 7, 2005.

On or about February 15, 2005, Plaintiff submitted an application for short term disability benefits to Sun Life. The application included Sun Life's Short Term Disability Attending Physician's Statement ("STAPS"), which was signed by Dr. Seo on February 15, 2008. (R. 43–50) The STAPS lists Plaintiff's diagnosis as radiculopathy C6 and C7 with the objective findings of: "EMG negative; Brachioradialis (C6 reflex) absent on right." (R. 43). Dr. Seo listed Plaintiff's condition as a Class 5 severe limitation, indicating that Plaintiff is incapable of even minimum or sedentary activity. Next to that notation, Dr. Seo noted that Plaintiff needs "rest for recovery for at least [two] more weeks." (R. 44).

Sun Life denied Plaintiff's claim for short term disability benefits on April 21, 2005 because the no-fault motor vehicle benefit that Plaintiff was to receive during this period exceeded her short term disability benefit. (R. 383). Sun Life cited a conversation with Plaintiff's motor vehicle insurance carrier in which the insurance carrier confirmed that Plaintiff has been receiving eighty-five percent wage loss since February 7, 2005 and that this benefit will continue for three years from February 7, 2005 or until Plaintiff is no longer disabled. (R. 383).

Sometime before July 25, 2005, Plaintiff filed a claim for long term disability benefits from Sun Life. On August 15, 2005, Dr. Seo completed Sun Life's Long Term Disability Attending Physician's Statement ("LTAPS"). (R. 25). In the LTAPS, Dr. Seo notes Plaintiff's diagnosis as radiculopathy C5 and neck, arm, and shoulder pain. (R. 25). In support of that diagnosis, under the heading "Objective Findings," Dr. Seo references unidentified reports and states that the Spurling maneuver is positive and brachioradials relex is trace on the right and absent on the left. (R. 25). Dr. Seo then identifies Plaintiff's condition as a Class 5 impairment (severe limitation of functional

capacity; incapable of minimum (sedentary[]) activity.

In a letter dated November 21, 2005, Sun Life denied Plaintiff's claim for long term disability benefits.  (R. 308).  After setting forth the applicable provisions from the Plan, Sun Life stated that its assessment included an evaluation of medical records provided by Dr. Seo and Dr. Askar, a medical consultant review,[3] and a review of all other information in her file.  Sun Life then set forth a brief summary of that review and ultimately concluded that the medical documentation in Plaintiff's file does not substantiate the restrictions and limitations outlined by Dr. Seo of Plaintiff's inability to perform the material and substantial duties of her occupation as a sales associate.  (R. 310).  As a result, Sun Life determined that Plaintiff did not qualify for benefits under the terms of the Plan.  (R. 310).

Plaintiff requested an appeal of Sun Life's denial of her long term disability claim but did not include any additional information in support of her disability with the letter.  (R. 316).   On July 27, 2006, Sun Life denied Plaintiff's claim.  (R. 338).  Besides relying on the medical documentation provided in the original claim, Sun Life relied on a medical review of Plaintiff's file conducted by Ronald Tolchin, D.O., FAAPM&R, a board certified doctor in physical medicine and rehabilitation and pain medicine and spinal cord injury.  In addition, rehabilitation consultant Robert Violetta M.S., C.R.C., C.D.M.S., performed an occupational analysis of Plaintiff's occupation to determine how Plaintiff's occupation is recognized in the national economy.

Dr. Tolchin reviewed all of the medical records used by Sun Life in making its initial benefits determination.  Dr. Tolchin deemed Dr. Seo's physical examinations as "weak" because Dr. Seo did  not note any motor strength or sensory loss testing or any signs of weakness. (R. 331–32).

---

[3] A registered nurse, Deborah Dirck, RN, reviewed Plaintiff's file on October 18, 2005.

Dr. Tolchin noted that Dr. Seo's findings were based instead entirely on reflexes and an incomplete Spurling maneuver—both of which could be highly subjective—and a very weakly positive EMG and nerve conduction study. (R. 331–32).

Dr. Tolchin also disagreed with the restrictions and limitations imposed by Dr. Seo and noted several internal inconsistencies with them. For instance, Dr. Tolchin highlighted Dr. Seo's examination notes from Plaintiff's February 9, 2005 visit in which Dr. Seo states that Plaintiff "was told that since she could control her workload and pace, she could return to work," and the STAPS and the LTAPS in which Dr. Seo imposes severe limitations and restrictions despite Plaintiff's lack of pathology. (R. 330, 333). Dr. Tolchin opined that "the restrictions and limitations as determined by the medical information presented would be that the claimant could function on an [eight] hour basis with light-duty exerting up to [twenty] pounds of force occasionally and/or up to [ten] pounds of force frequently and/or a negligible amount of force constantly to move objects." (R. 335).

To determine how Plaintiff's occupation is recognized in the national economy, Violetta referenced the Dictionary of Occupational Titles ("DOT") issued by the Department of Labor and found that Plaintiff's occupation as a sales associate at Art Van corresponded closely to that of Furniture Salesperson, DOT code 270.357-030. (R. 319). According to the DOT description, this occupation exists typically at the light exertion level and includes but is not limited to: (1) lifting, carrying, pushing, pulling twenty pounds occasionally and ten pounds frequently, (2) frequent standing and walking during the work day, (3) frequent reaching, handling, fingering, talking, hearing, and color vision, and (4) occasional stooping, crouching, feeling, and near acuity. (R. 319).

Plaintiff filed the instant action in Macomb County Circuit Court on March 27, 2008, asserting four counts of ERISA violations against both Sun Life and Art Van. The first two counts

seek to recover full benefits and the last two counts seek a remedy for the Defendants' alleged

breach of fiduciary duty against Plaintiff.  The Defendants removed the case to federal court on the

basis of federal question on March 2, 2008.  After Plaintiff and Sun Life filed the instant motion, the

Court granted a stipulated order to dismiss Defendant Art Van from the suit on October 1, 2008.

(Dkt. No. 12).

## II. ANALYSIS

### A.    Standard of Review: ERISA Denial of Benefits Claim

The courts do not employ the traditional summary judgment standard to determine whether

to uphold a decision that an ERISA benefit plan administrator rendered. *See, e.g.*, *Wilkins v. Baptist*

*Healthcare Sys.*, 150 F.3d 609, 613–15, 619 (6th Cir. 1998).  When an ERISA benefit plan expressly

grants the plan administrator discretionary authority to determine eligibility for benefits or to

construe the terms of the plan, a court reviews such a determination or construction under the

arbitrary and capricious standard.  *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111–15,

(1989); *Williams v. Int'l Paper Co.*, 227 F.3d 706, 710–11 (6th Cir. 2000).  Conversely, a court

conducts a de novo review of a plan administrator's denial of benefits absent an express grant of

discretionary authority to that administrator. *See Firestone*, 489 U.S. at 115; *Williams*, 227 F.3d at

710–11.

> The arbitrary and capricious standard is the least demanding form of judicial review
> of administrative action.  When applying the arbitrary and capricious standard, the
> Court must decide whether the plan administrator's decision was *rational in light of*
> *the plan's provisions*.  Stated differently, when it is possible to offer a reasoned
> explanation, based on the evidence, for a particular outcome, that outcome is not
> arbitrary and capricious.

*Williams v. Int'l Paper Co.*, 227 F.3d 706, 712 (6th Cir. 2000) (internal citations and quotations

omitted) (emphasis added).

In the instant case, the parties do not dispute that the Plan expressly grants discretionary authority to the Sun Life and, therefore, that the Court should apply the arbitrary and capricious standard.   Accordingly, the Court applies the arbitrary and capricious standard in reviewing Sun Life's denial of Plaintiff's claim.

In so doing, however, the Court is mindful of the U.S. Supreme Court's recent decision in *Metropolitan Life Insurance Company v. Glenn*, 128 S. Ct. 2343 (2008).  In *Metropolitan Life*, the Supreme Court held that when an entity administering an employee benefits both determines whether an employee is eligible for benefits and pays benefits out of its own pocket, it operates under a conflict of interest.  *Id*. at 2349.  That conflict of interest, however, does not mandate that a *de novo* review be automatically applied.  *Id*. at 2350.  Instead, "a reviewing court should consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits."  *Id*. at 2346.  "[T]he significance of the factor will *depend on the circumstances of the particular case*."  *Id*. (emphasis added).

In the present action, Sun Life, as plan administrator, not only determines eligibility for benefits but also underwrites the benefits at issue.   Therefore, Sun Life's dual role creates a conflict of interest—one that this Court considered in its determination of whether to grant the relief that Plaintiff requests.   As noted in *Metropolitan Life*, however, the significance of the conflict of interest as a factor depends on the circumstances presented in this case.

### B.    Sun Life's Denial of Benefits

With the above standards in mind, the Court turns to the benefit denial at issue here and Plaintiff's assertion that Sun Life acted arbitrarily and capriciously in denying her claim.

The Sixth Circuit has utilized a number of factors when considering whether a plan

10

administrator's denial of benefits in an ERISA claim was arbitrary and capricious, including the existence of a conflict of interest; Social Security Administration ("SSA") determinations of total disability; and the quality and quantity of medical evidence, with an emphasis on the nature of the review conducted by the administrator. *See, e.g.*, *Glenn v. MetLife*, 461 F.3d 660, 666–674 (6th Cir. 2006).

   As noted above, it is clear that Sun Life's dual role of determining eligibility and paying benefits created a conflict of interest. This conflict of interest weighs against Sun Life in the Court's overall calculus of whether Sun Life's denial of Plaintiff's claims was arbitrary and capricious.

   With regard to the SSA determination factor, because there is no evidence in the record that Plaintiff ever even applied for SSA benefits, the Court does not consider any such determination in its analysis, nor does it draw any inferences from the absence of such information in the record.

   Therefore, the primary issue becomes whether Sun Life's review of the medical evidence in the administrative record was arbitrary and capricious. The Court's obligation under ERISA to review the administrative record in determining whether Sun Life acted arbitrarily and capriciously "inherently includes some review of the quality and quantity of the medical evidence and the opinions on both sides of the issues." *McDonald v. W. S. Life Inc.*, 347 F.3d 161, 169 (6th Cir. 2003).

   Plaintiff's primary challenge of Sun's Life review of the administrative record is based upon Sun Life's reliance on Dr. Tolchin's file review over Dr. Seo's treating physician review. Plaintiff first contends that Dr. Tolchin's opinion should be discounted because Dr. Tolchin never actually

examined Plaintiff.[4]   According to the Sixth Circuit, however, there is "nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination." *Calvery v. Firstar Finance, Inc.*, 409 F.3d 286, 296 (6th Cir. 2005).  "[I]f a file review is otherwise thorough, the failure to examine a claimant is not fatal to a denial decision." *Bauer v. Metro. Life Ins. Co.*, 397 F. Supp.2d 856, 864–66 (E.D. Mich. 2005).  In fact, a plan administrator may choose to rely upon a file review over a treating physician review so long as the plan administrator considered the opinion of the treating physician and the file review was reasonable based upon the available medical evidence.  *Harris v. Kemper Ins. Co.*, 360 F. Supp. 2d 844, 849 (E. D. Mich. 2005) (citing *Black & Decker Disability Plan v. Nord*, 538 U.S. 822 (2003).  Still, Dr. Tolchin's reliance on the medical record as opposed to his own examination of Plaintiff is a "factor [to] consider in determining whether a plan administrator acted arbitrarily and capriciously in giving greater weight to the opinion of its consulting physician." *Kalish v. Liberty Mutual/Liberty Life Assurance Co.*, 419 F.3d 501, 508 (6th Cir. 2005).

Plaintiff next contends that Dr. Tolchin ignored objective medical evidence allegedly supporting a finding of Plaintiff's disability.   First, it is important to note that Plaintiff has failed to identify any aspect of the medical record that Dr. Tolchin failed to consider or account for in arriving at his opinion.   For instance, Plaintiff does not cite any relevant portion of Plaintiff's medical history or treatment record, whether from Dr. Seo or any other physician, that Dr. Tolchin

----

[4] Just before Sun Life denied Plaintiff's appeal, Sun Life's claim examiner considered scheduling an independent medical examination but decided against it because too much time had passed from the time Plaintiff had stopped working.  (R. 361).  The claim examiner felt that an independent medical examination would not verify what Plaintiff's restrictions and limitations were in February 2005. (R. 361).

did not review or even additional records that might have led Dr. Tolchin to reach a different conclusion. In fact, Plaintiff seemingly admits that Dr. Tolchin conducted a complete review of the record when Plaintiff argues in her brief that Dr. Tolchin "clos[ed] his eyes to the test reports he admits he reviewed." (Pl.'s Br. 10). Thus, Plaintiff is challenging Dr. Tolchin's findings—and Sun Life's subsequent reliance on those findings—not any defect in the file that Dr. Tolchin reviewed.

Plaintiff argues that Dr. Tolchin ignored several pieces of objective medical evidence contained within the file. Plaintiff points to (1) the January 1, 2005 MRI, which revealed a "very small annular disc bulges at C4-C5 and C5-C6"; (2) the May 24, 2005 EMG, which showed "mild" radiculopathy on the right side but no evidence of peripheral polyneuropathy; (3) multiple Spurling foramina compression tests, which tended to be positive for nerve root irritation in the C6 and C7 area; and (4) multiple reflex tests, which generally revealed trace or only slight brachioradialis and tricep reflexes.

Contrary to Plaintiff's assertion, Dr. Tolchin did not ignore the objective evidence in Plaintiff's file. Rather, Dr. Tolchin opined that these objective findings were weak and did not support the restrictions and limitations set forth by Dr. Seo. Dr. Tolchin acknowledged that the MRI showed a very small annular disc bulge at C4-C5 and C5-C6 but no frank herniation, spinal stenosis, or neural foraminal stenosis. (R. 332). With regard to the May 24, 2005 EMG, Dr. Tolchin noted that it showed increased insertional activity but that "is a very weak finding and often very subjective." (R. 333). Dr. Tolchin also stated, "[i]n the absence of fibrilliation potentials or positive sharp waves in the limb muscles, it would be highly unusual to have a markedly positive radiculopathy." (R. 333). Dr. Tolchin also criticized Dr. Seo's physical examinations—the Spurling

maneuvers and reflex testing—as weak because Dr. Seo did not conduct any motor strength tests or sensory examinations during any of her examinations of Plaintiff.

In addition, besides providing several convincing critiques of Dr. Seo's treatment and findings, Dr. Tolchin noted a few inconsistences with them.  For instance, on February 9, 2005, only two days after Plaintiff applied for leave under FMLA, Dr. Seo told Plaintiff that she could return to work because Plaintiff could control her workload and pace.  But then less than a week later, Dr. Seo indicated that Plaintiff suffers from a Class 5 impairment—the most restrictive impairment listed on either the STAPS or the LTAPS.  The Court too finds it odd that Dr. Seo would tell Plaintiff that she could return to work one week (R. 286), and then after Plaintiff's reevaluation less than a week later remained the same—except for a significant reduction in Plaintiff's reported leg pain (R. 288)—he would state on the STAPS that Plaintiff was not capable of working at her occupation or any other occupation for that matter.  (R. 44).

Sun Life did not act arbitrarily or capriciously in favoring Dr. Tolchin's file review over Dr. Seo's opinion as Plaintiff's treating physician because Sun Life's actions were rational under the circumstances.   Sun Life initially denied Plaintiff's claim after having the file reviewed by a medical consultant, Deborah Dirck, R.N.  The denial letter explicitly stated that the medical documentation in Plaintiff's file did not substantiate her inability to work as of February 7, 2005—Plaintiff's last day at Art Van.  According to the Plan, proof supporting Plaintiff's disability claim must be "satisfactory" to Sun Life.   Thus, in Sun Life's opinion, Plaintiff's proof was not satisfactory.[5]   Yet, instead of seeking a second opinion or additional medical documentation to

---

[5] Plaintiff also argues that the reason for denying Plaintiff benefits changed from the original denial to ultimate basis for denying her benefits on appeal.  The Court finds this argument without merit, as both letters explicitly explain that Sun Life found Plaintiff not to be disabled

substantiate her claim of disability, Plaintiff merely filed for an appeal of her long term benefits determination.

Sun Life, on the other hand, hired a vocational rehabilitation consultant, Robert Violetta, and another medical consultant, Dr. Tolchin, to review Plaintiff's file. (R. 361). Mr. Violetta confirmed Plaintiff's occupation as it is generally recognized in the national economy. This finding is critical for a benefits determination under the Plan because the Plan does not define disability based upon a claimant's ability to perform the duties of her previous occupation. Rather, it provides that in order to be entitled to long term disability benefits, Plaintiff must prove that she is totally disabled from performing the material and substantial duties of her occupation as that occupation is generally recognized in the national economy. (R. 483). The Plan expressly states that the definition of her occupation is "not limited to the job or position [Plaintiff] performed." (R. 482).

Mr. Violetta opined that Plaintiff's job description from Art Van matched that of a typical furniture salesperson in the national economy. According to the Dictionary of Occupational Titles, that occupation is classified as "light exertion level – i.e. lifting, carrying, pushing, pulling 20 lbs. occasionally, 10 lbs. frequently, reaching, handling, fingering, talking, hearing and color vision; and occasional stooping, crouching, feeling and near acuity." (R. 319). Even though Art Van's job description[6] requires more physical qualifications than those listed in the Dictionary of Occupational

within the definition of the Plan.

[6] Art Van's job description for the position of sales associate requires certain physical qualifications. (R. 68–69). These include the

- Ability to bend, twist, reach, pull, push, carry and walk
- Ability to lift a minimum of twenty-five (25) pounds
- Ability to maneuver merchandise and parts into or out of the showroom
- Ability to lift arms overhead to reach equipment, parts, supplies or to move merchandise

Titles, the latter governs Plaintiff's long term disability determination because it represents how Plaintiff's occupation is generally recognized in the national economy.

As set forth above, Dr. Tolchin conducted a thorough review of the Plaintiff's file and provided reasoned explanations for his findings.   Dr. Tolchin's report of his file review was ten single-spaced pages long and consisted of a detailed review of thirty-six separate documents. Ultimately, Dr. Tolchin found that "the restrictions and limitations as determined by the medical information presented would be that [Plaintiff] could function on an 8 hour basis with light-duty exerting up to 20 pounds of force occasionally and/or 10 pounds of force frequently and/or a negligible amount of force constantly to move objects."  (R. 335).  Thus, Dr. Tolchin opined that Plaintiff was not totally disabled from performing her occupation as a furniture salesperson as that occupation is generally recognized in the national economy.

Because Sun Life's decision to deny Plaintiff long term disability benefits under the Plan was not arbitrary and capricious, the Court GRANTS Sun Life's Motion for Entry of Judgment and DENY Plaintiff's Motion for Entry of Judgment.

**C.     Plaintiff's Breach of Fiduciary Duty Claim**

In Count III of the Complaint, Plaintiff asserts an ERISA breach of fiduciary duty against Sun Life under ERISA section 502(a)(3), 29 U.S.C. §1132(a)(3).  (Compl. ¶ 14, 16).  These allegations constitute nothing more than a reproduction of Plaintiff's claim for disability benefits. The Sixth Circuit has repeatedly held that where an adequate remedy exists for an ERISA claimant,

---

- Ability to stand approximately 90% of work period
- Ability to work extended hours (up to 12 hour/day) on a regular basis

(R. 69).

16

supplemental claims asserting breach of fiduciary duty should be dismissed. *See, e.g., Wilkins*, 150 F.3d 609 (holding that a ERISA plan participant cannot seek relief for a breach of fiduciary duty under 29 U.S.C. § 1132(a)(3) if the alleged violations are other provisions of 29 U.S.C. § 1132); *Marks v. Newcourt*, 342 F.3d 444, 454 (6th Cir. 2003) ("In this case, Marks is permitted to file and has filed a suit pursuant to [§ 1132(a)(1)(B)], challenging the administrator's decision to deny benefits. Therefore, because the district court is correct that ERISA § [1132](a)(1)(B) provides plaintiff a remedy for the alleged injury . . . we affirm the dismissal of Mark's claim for breach of fiduciary duty" (internal citations omitted)). As Sun Life notes in its brief, "[t]he declaratory relief as against Sun Life that Plaintiff seeks in Count[s] I [and II] of the Complaint – that she is entitled to benefits under the [Plan] – provides an adequate remedy for all of her claims." (Def. Br. 17). Accordingly, the Court DISMISSES Count III of the Complaint.

## III.    CONCLUSION

For the reasons stated, the Court DENIES Plaintiff's Motion for Judgment (Dkt. No. 11), GRANTS defendant Sun Life's Motion for Entry of Judgment (Dkt. No. 10), and DISMISSES Plaintiff's ERISA breach of fiduciary duty claim against Sun Life.

**SO ORDERED**.

S/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  January 26, 2009

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on January 26, 2009.

S/Denise Goodine
Case Manager

17
